v. Brown, Mr. Wilkerson Good morning, your honors, and may it please the court. My client's trial was a credibility contest between himself and his father, Lee Bryant. The question was whether the jury would believe my client, a troubled 17-year-old kid, or his father, a habitual abuser, who my client testified was the real killer. Does he have a criminal record, the father? My client? The father. He'd been arrested for domestic violence in the past. Aside from that, his criminal record's not in the record. The physical evidence and the testimony in this case were consistent with my client's story, but the two public defenders that represented him made numerous egregious errors, and he was ultimately convicted. I'm not here today to pick around the edges of the state's case. The errors that we're talking about are serious and meaningful. What's the most serious error? I think probably the most serious of these is the fact that the public defenders failed to preserve an objection to inadmissible testimony from two police officers that they heard my client confessing to his mother shortly after he was arrested. The other errors at issue, the second is that they failed to impeach testimony from a witness named Alcorn, who testified that my client had been heard threatening to kill the victim, despite the fact that she'd never made any such statement in various police interviews and interviews with defense counsel before trial. They also failed to object to a juror question that led to the admission of my client's juvenile convictions, despite a pretrial ruling by the court that those convictions were not admissible. They opened the door to testimony about a prior altercation between my client and his mother, despite warning just the day before from the judge that an almost identical question would open the door to that testimony. And then the state withheld evidence that just two days before the murder, the victim said that she intended to leave her husband but was afraid that he would kill her if she did, and those were threats she believed given his long history of savage abuse. But let me first address this supposed confession, if that's really what it was. The court should understand that the only evidence that this confession actually happened was the testimony of the two police officers. The state argues in this brief that this testimony was cumulative of other testimony from my client and his mother, but that's simply not true. The officers said that they heard my client say, quote, I told dad there was a problem, he didn't take care of it, so I did. Neither my client nor his mother testified to anything of the sort. My client categorically denied that he'd ever said that he was going to, quote, take care of any problem with his stepmother, and his mother testified that he repeatedly told her that he didn't do it, and even the audio tape of this supposed confession didn't corroborate the police officer's testimony. It's undisputed that that audio tape is inaudible. So if we put aside the state's red herring about cumulativeness, the question is, was trial counsel deficient in failing to object to the second officer's testimony, and we would submit that- What would be the basis of the objection? That it was inadmissible under the Indiana state statute, which provides that a private consultation with the parent must be provided before the defendant can speak to police, which the Indiana appeals court in the direct appeal concluded was an appropriate objection, a sustainable objection, and that, in fact, the testimony by the officer shouldn't have been admitted, and that their behavior was, quote, reprehensible and egregious. So obviously, counsel should have preserved this objection. They knew that this was objectionable. They'd raised it before trial. They even knew that the failure to object could result in a waiver. They admitted as much in the post-conviction proceedings. There's just no reasonable explanation for why they would fail to object to this. This was not a minor issue. This was a confession in a murder case. So why did the state court find that they weren't deficient? Well, they gave two reasons, and neither of those hold any water. So the first reason they gave is that the objection would have been futile. They said, well, counsel objected before trial, and it was overruled. So is it your notion that he should have been, your client should have been acquitted, and the father prosecuted? Well, obviously, we don't have any say. My client never had any say in how the prosecution would go forward. No, no, no, obviously not. But I'm asking you whether you think that would be the logical sequence. Well, the logical sequence, had counsel not made the errors that they made and had the evidence been provided to them that should have been provided to them by the state, would be an acquittal. How do you know? How do we know? Well, what we know is that this was a case in which essentially there was no direct. But if he were acquitted, there's not a lot of evidence against him. That poetry is not helpful to him. If he were acquitted, would you expect the father to be indicted? I have no idea whether the father would be indicted. Should he have been? Likely, but I don't have access to everything that the state knew about the father or any insight into whether the state prosecutor would have pursued that case. So let's talk about why the state court said that this objection was not deficient to make this objection. They gave two reasons. The first they said is that it was futile and that because the trial counsel had been overruled when it made the objection before trial and when it had made the objection to the first attorney's testimony that they did not need to make. The first officer's testimony. I'm sorry, the first officer's testimony that they did not need to object the second time. That's just utterly inconsistent with decisions from both this court and the Supreme Court, which have said that trial counsel needs to preserve objections for appeal. If every time an objection will be overruled, that means trial counsel doesn't need to make the objection. Then there's no duty to preserve an objection for appeal, and we know that's not the case. Well, that's not quite the right lens to look at this through. The existence of a duty to preserve in order to get review is different from the question of whether it's ineffective not to, and there might be all kinds of countervailing reasons not to lodge an objection that would be necessary to preserve an argument for appeal. Well, I agree, and that's what I was going to move to next, which is, okay, well, why did this attorney fail to make this objection? Well, we have testimony from the attorney. What the attorney said is it was a mistake. I knew I needed to preserve this objection for appeal. Right, but that's a subjective view. We're looking at this through an objective standard, whether it was constitutionally ineffective, which is a very high bar, incompetent. Right, absolutely. It is true that it is a very high bar. This is also a confession in a murder case, and an attorney who said that they had no strategic reason. And what this court has said. Right, but without the 20-20 hindsight. At the time, counsel knew that the testimony was coming in through another witness. Right, and the only evidence that we have of what counsel was thinking at the time is counsel's own testimony. With the benefit of 20-20 hindsight. Absolutely, that's true. But this court and the Supreme Court regularly relies upon counsel's post-conviction testimony about what their strategic reasons were. Right, when we're doing plenary Strickland review. We're not in that domain now. In habeas cases as well, that happens all the time. There's several cases cited in our brief, and there's more cases that I could cite. And what the post-conviction court said is that it couldn't consider that testimony because it was hindsight. And that simply is inconsistent with decisions from this court and the Supreme Court. But then a defendant's lawyer thinks that the case is going badly can throw it. Well, that's true. You know, just say that you can throw it. A defense attorney could throw it. There's no. In fact, he would have an ethical obligation to throw it. Well, no. He would have an ethical obligation to make an error, and then confess his own error in order to see if he can get his client another trial. Right. That's an extraordinary position. Well, I don't take that position. I mean, if, in fact, in this case, there had been some holding by the state court. The question is how you distinguish what happened here from that hypothetical. Well, look, I mean, to the extent you're suggesting. You can see how a lawyer would think, you know, I can't get anywhere in this case. I'm going to throw it. Well, I don't think there's any reason to believe that happened in this case. There's no evidence to that effect. I don't know how you'd get evidence for it. And, in fact, I would, you know, if we're looking at this attorney and saying would we expect this attorney to make these kind of errors, it's a matter of public record that this attorney has now given up her license and is in state prison for manufacturing methamphetamine. So this is an attorney who, it's not surprising, would make these kinds of errors. I want to move on so I can briefly address the Brady claim before my time runs out. There could hardly be a more clear example of a Brady violation than we have in this case. At the post-conviction hearing, Tracy Beamer testified that just two days before she was murdered, the victim had told her that she wanted to leave her husband but was afraid that he would kill her if she did. She gave the police a written statement to this effect that was never turned over to the defense, and the state doesn't even seriously contest that, in fact, there was such a written statement that was not turned over to the defense. And we think the idea that this didn't prejudice the defense in this case is frankly ludicrous. This was their defense. The state knew it was their defense. Were there fingerprints on her throat? There was no testimony. By the way, I see my time has run out, but I'm happy to answer your question. There was no physical evidence of any fingerprints on her throat or anything like that. Thank you, Your Honor. Okay, thank you, Mr. Wilkinson. Mr. Crow? May it please the Court. The Indiana Court of Appeals reasonably applied Strickland and Brady. Defense counsel's strategy was to portray Bryant's father as the killer to give the jury reasonable doubt about Bryant. As part of that strategy, counsel initially tried to keep Bryant's statement to his mother out by objecting to Detective Bowman's testimony at trial. When the court overruled that objection, counsel did what they could to try to mitigate the damage. First, they highlighted all of Detective Bowman's inconsistencies about where he was when he heard that statement, his inconsistencies between the grand jury testimony, the suppression hearing, and then at trial to show that he was not a credible witness in front of the jury. Defense counsel also presented the video, not the video, but the audio recording of the interview with Bryant's mother to show the jury how poor the audio was, as if to say, if you can't hear him say the statement, how could the officers have heard that statement themselves? So when Officer Whelan testified about the same statement, counsel already knew what the court's ruling would have been had they objected to that statement. So therefore, it was futile to object because they knew what the outcome of that ruling was going to be, and so their objective was not to highlight that statement, not to object too much to make it look like they were hiding something from the jury, because they knew what the ruling on that objection would be. Counsel also presented Bryant's mother's testimony to contradict what the officers said, and Bryant's mother testified that Bryant said repeatedly during the consultation, I didn't do it, I didn't do it. So the jurors had that testimony to weigh with the officers' testimony of what they heard and the recording of what the jurors could have heard themselves. Bryant was not prejudiced by this testimony because there was substantial independent evidence of his guilt. He was the last person seen with the victim while she was alive. He drove around in her car for three days with her body in the trunk, as if the car were his own, and he gave away and sold some of her jewelry. There was also a shoestring from his boot that was in his room that was wrapped around the victim's body, wrapped around the comforter in the trunk. That shoestring came from Bryant's boot, and of course, the victim was killed by ligature strangulation. There were no fingerprints, Your Honor. Was killed by what? By ligature strangulation. Oh, not by finger. That's correct. Yes. Bryant also wrote poetry and rap lyrics that seemed to foretell Carol's fate or the victim's fate. He said that if she were still there on Thursday, he would be gone, and of course, she went missing on Wednesday. He also said in a rap lyric that the people wouldn't be able to recognize you when they pulled you out of a car, which of course is where they found her, in the trunk of a car. And her DNA is on his pants? That's correct. That's correct. Jeans that were his, her DNA matched that. On the Brady claim, the state did not withhold material evidence from the defense because counsel could have contacted Beamer. They knew that the detective had spoken with Beamer based on his report, so they could have contacted her, so therefore the state did not withhold that evidence. Now, as far as whether there was a written statement, Beamer testified that she did give a written statement. Detective Bowman testified that he could not find a written statement. He didn't know of a written statement. The court never explicitly found that there was one. The court just analyzed the claim as if there had been a written statement. And of course, had there been a written statement, counsel still could have contacted Beamer and asked if she gave a written statement to the officer. If she gave a written statement to the officer. So they could have done that, so the state did not withhold that evidence. And the testimony that Beamer could have offered would not have reasonably made a difference in the outcome of the trial or been material under a Brady analysis, because the information that she had would have been hearsay, so it would not have been admissible at trial. If there are no further questions, I will rest on my brief. Okay, thank you, Mr. Drum. Mr. Wilkerson. I just want to take one minute to address some of what was said by opposing counsel. First of all, all of the evidence that opposing counsel mentions and that is discussed by the state is consistent with my client's testimony. There was no dispute that my client had the car and was in possession of the victim's jewelry and the body after the murder. That was consistent with his story. The critical time period here is not after the murder, days later. The critical time period is the murder. On that, there was two pieces of evidence that implicated my client. There was a supposed confession overheard by police officers and there were testimony of a threat to kill by Alice Alcorn. Neither of the, well, the confession should never have come in and would have been determined to have been inadmissible on appeal, but for failing to preserve. If his father had killed her, why wouldn't he have had the jewelry? I'm sorry, can you say that again? I didn't hear you. If the father had killed the stepmother, why wouldn't he have the jewelry? Well, the testimony from my client, which was consistent, in fact, with the timeline of events that was established at the trial, was that the father came home from work and killed the wife during a fight while he was on lunch break. The absolutely natural thing to do, not that it's natural to kill your wife, but if you've done so on lunch break and you don't want to be implicated, you're the husband who everyone knows to be abusive is to go back to work. That's precisely what my client testified happened here. Why did he then put his stepmother in the trunk of his car and drive around for four days with her jewelry without bothering to go to the police? Well, the testimony from my client was that his father, in fact, asked him to do it. His father asked him to do it, but the idea that you're going to steal your stepmother's jewelry in order to get away from your father permanently, and you then drive around with your stepmother's body in the trunk of your car for an extended period, not going to the police, not doing anything, is awfully hard to reconcile with a claim of innocence. Let me say a few things. First of all, obviously, it is not appropriate behavior to drive around with your stepmother's body. We're not arguing that. Or anybody else's body. That's correct. But first of all, the state keeps saying three days, four days. That's not true. The car broke down, and he was not in possession of the car after a day and a half. Obviously, so it's not days and days. He did not go to the police and say there is a body in this broken-down car. That's correct. And had he done so, he would have been implicating his father. And so is it appropriate behavior? No. Is it believable that a son does not want to implicate his father? And himself, by the way, who is now an accessory after the fact. He was perfectly happy to implicate his father. That was his defense. Right. After he was arrested for the murder and his father let him be convicted. Yeah. Well, one could understand this as I've murdered my stepmother. I'm going to try to get away with it. When I fail to get away with it, I'll try to blame somebody else. It's awfully hard to interpret the record any other way. Well, the evidence is fully consistent with another story, which is that his father murdered his stepmother on a lunch break after beating her savagely for years. And that's what we think the jury may well have found. We certainly think there's a better-than-negligible chance, which is what's required under Strickland, but for the errors of this counsel. Thank you. Okay. Well, thank you very much, Mr. Wilkerson and Mr. Drumm.